1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| DONALD BANGO and SCOTT BAILEY, individually and on behalf of all others similarly situated,<br><br>               Plaintiffs,<br><br>      v.<br><br>PIERCE COUNTY, WASHINGTON; BRUCE DAMMEIER, in his official capacity as Pierce County Executive; PIERCE COUNTY SHERIFF'S DEPARTMENT; PAUL A. PASTOR, in his official capacity as Pierce County Sheriff; PATTI JACKSON-KIDDER, in her official capacity as the Pierce County Chief of Corrections; JANET RHOTON, in her official capacity as the Pierce County Jail Mental Health Manager, and their officers, agents, employees, and successors,<br><br>               Defendants. | No.<br><br>**COMPLAINT – CLASS ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## I.     INTRODUCTION

1.     Plaintiffs, who are people with mental illness incarcerated in the Pierce County

Jail ("the Jail"), bring this class action seeking declaratory and injunctive relief on behalf of

Complaint - 1

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

1   themselves and all others similarly situated to seek judicial relief from the suffering and

2   psychological harm they are experiencing at the hands of Defendants.

3       2.      Defendants have long known about the applicable legal standards that govern the

4   treatment of individuals incarcerated with mental illness—in part because they were sued more

5   than 20 years ago by a similar class of plaintiffs with similar claims.  Defendants nevertheless

6   continue to violate constitutional and statutory law, correctional facility guidelines, and basic

7   standards of human decency.

8       3.      Defendants do not adequately screen for mental illness during the booking

9   process or during incarceration, ignore clear signs of mental illness and requests for care and, as

10  a result, routinely fail to document serious mental health symptoms, psychiatric medications, and

11  treatment history.

12      4.      Having failed to appropriately identify those who are mentally ill, Defendants

13  then refuse to provide necessary treatment to Plaintiffs and others similarly situated for their

14  mental illnesses.  Plaintiffs often go months without seeing a mental health provider, experience

15  significant delays in receiving prescription psychiatric medications, and are denied basic mental

16  health care, despite repeated requests for treatment.

17      5.      As a direct result of Defendants' practice of inappropriately delaying and refusing

18  to provide basic mental health treatment, Plaintiffs' mental illnesses are allowed to progress

19  unchecked, leading to hallucinations, delusions, and an increased risk of self-harm.

20      6.      Instead of promptly providing necessary treatment, Defendants punish Plaintiffs

21  and other similarly situated for non-violent behaviors directly related to their mental illnesses.

22  Defendants use eyebolt restraints to chain people's arms and legs to the floor, deploy pepper

23  spray, and leave people in the throes of mental health crises in restraint chairs for hours on end.

Complaint - 2

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

7.      Despite the clinically proven negative impacts of isolation on people with mental illness, Defendants routinely warehouse these individuals in solitary confinement for 21 to 24 hours a day, where they predictably deteriorate.

8.      Defendants then compound these problems by refusing to provide people released from their custody with a supply of their psychiatric medications, as required by law. Defendants release people with florid mental illness directly into the community, where they may present a safety risk to themselves or to others.  Due to their untreated illnesses, many will end up back at the Jail at taxpayer expense.

9.      Defendants' failure to exercise appropriate supervisory authority over the Jail and to prevent the psychological deterioration of the most vulnerable in their care is plainly unlawful. The Eighth Amendment's prohibition on cruel and unusual punishment and the Fourteenth Amendment's guarantee of due process together protect individuals' right to be free from a substantial risk of serious harm while incarcerated.  These protections include the right to constitutionally adequate mental health treatment and the right to be free from the unnecessary and wanton infliction of pain.

10.     Moreover, Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act prohibit the use of solitary confinement up to warehouse people because of their mental illness, and requires that such individuals be provided with equal access to the programs, services, and activities offered in the Pierce County Jail.

11.     These federal laws prohibit the discriminatory use of force and restraints on people in response to non-violent behavior directly related to their mental illnesses, and require that Defendants make reasonable modifications to their policies, practices, and procedures to avoid discrimination on the basis of disability.

Complaint - 3

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

12.     Defendants' long-standing pattern and practice of neglect has directly caused serious ongoing irreparable harm to Plaintiffs and similarly situated individuals and contributes to a revolving door of incarceration that is both costly and detrimental to public safety.

13.     Plaintiffs have no adequate remedy at law.

## II.     JURISDICTION AND VENUE

14.     This Court has jurisdiction over the claims brought under federal law pursuant to 28 U.S.C. §§1331 and 1343.  Plaintiffs seek declaratory and injunctive relief under 28 U.S.C. §§ 1343, 2201, and 2202, 29 U.S.C. § 794a, 42 U.S.C. §§ 1983 and 12117(a).

15.     Venue is properly in this Court pursuant to 28 U.S.C. § 1391(b) because Plaintiffs' claims for relief arose in this District and one or all of the Defendants reside in this District.

## III.     PARTIES

**A.     Named Plaintiffs**

16.     Named Plaintiff Donald Bango is a 40-year old veteran who is incarcerated at the Pierce County Jail. Mr. Bango served in the United States military for fifteen years, including tours in Iraq and Afghanistan.  He achieved the rank of a Staff Sergeant, and received multiple awards for his service—including a Bronze Star, a Meritorious Service Medal, an Army Commendation for Valor, and an Army Achievement Medal.  Mr. Bango was medically retired from the military in 2010 due to mental health issues stemming from the violence he witnessed during his service in Iraq.

17.     Mr. Bango has been diagnosed with bipolar disorder, posttraumatic stress disorder (PTSD), major depressive disorder, and panic disorder, and is a qualified individual with a disability as that term is defined in 42 U.S.C. §12102 and 29 U.S.C. §705(9)(B).  He experiences

Complaint - 4

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

visual and auditory hallucinations, including hearing voices, as well as delusions and flashbacks. He also experiences frightening nightmares that cause him to scream in his sleep, extreme mood swings, and panic attacks.

18.     Defendants have denied Mr. Bango medically necessary psychiatric medications and access to other basic mental health treatment during his incarceration.  They improperly placed him in solitary confinement and left him naked and alone in a cell with his arms handcuffed behind his back after pepper spraying his face.  The inappropriate use of isolation and force as well as the denial of care has caused Mr. Bango to mentally decompensate.

19.     Named Plaintiff Scott Bailey is a 45-year old man who is incarcerated in the Pierce County Jail.  Mr. Bailey has been diagnosed with major depression and experiences anxiety, and is a qualified individual with a disability as that that term is defined in 42 U.S.C. §12102 and 29 U.S.C. §705(9)(B).  Mr. Bailey regularly experiences suicidal ideation and has attempted to commit suicide many times.

20.     Mr. Bailey has been incarcerated at the Pierce County Jail approximately eight times since 1999.  Because Defendants placed Mr. Bailey on suicide watch during his incarceration in December 2014, including placing him in isolation with no clothing except a "suicide smock," they have knowledge and are on notice of Mr. Bailey's mental health issues and suicidal tendencies.

21.     Defendants have routinely failed to adequately screen Mr. Bailey's mental health conditions, mental health history, and use of psychiatric medications.  Defendants have failed to provide Mr. Bailey with timely access to psychiatric medications or basic mental health treatment, despite his repeated requests.  Defendants have placed Mr. Bailey at an unreasonable risk of self-harm and psychological decompensation.

Complaint - 5

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

**B.      Defendants**

22.      Defendant Pierce County (the "County" or "Pierce County") is a municipality chartered under the laws of Washington, and is a public entity as that term is defined in 42 U.S.C. §12131(1). The County operates and manages the Pierce County Jail and by law retains ultimate authority over and responsibility for ensuring the health, safety, and welfare of Plaintiffs and the class they seek to represent in a manner that comports with all legal obligations.

23.      Defendant Bruce Dammeier is the Pierce County Executive.  As Pierce County's chief executive officer, he is responsible for the supervision, management, review, and evaluation of all of Pierce County's administrative offices and executive departments, including the Pierce County Sheriff's Department.  He is sued in his official capacity.

24.      Defendant Pierce County Sheriff's Department (the "Sheriff's Department") is a department of the Pierce County executive branch and is a public entity as that term is defined in 42 U.S.C. §12131(1).  The Sheriff's Department is responsible for the day-to-day operations of the Pierce County Jail, including promulgating and enforcing Jail policies, procedures, and customs, as well as ensuring that Sheriff's Department deputies at the Jail comply with all legal obligations.

25.      Defendant Paul A. Pastor is the Sheriff of Pierce County.  He is responsible for the supervision of the Pierce County Sheriff's Department deputies in Pierce County, including the deputies that staff the Pierce County Jail.  He is also responsible for the proper execution of Sheriff's Department policies and the training of Sheriff's Department deputies.  Sheriff Pastor is sued in his official capacity.

26.      Defendant Patti Jackson-Kidder is the Pierce County Chief of Corrections.  She is responsible for the supervision of Pierce County Jail employees, the proper execution of Jail

Complaint - 6

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

policies, and the lawful treatment of individuals confined at the Jail.  Chief Jackson-Kidder is sued in her official capacity.

27.     Defendant Janet Rhoton is the Mental Health Manager at the Pierce County Jail. She is responsible for the leadership, oversight, and clinical direction of the Mental Health Program staff to ensure their compliance with governing laws and regulations.  She is also responsible for ensuring that the Mental Health Program provides people incarcerated at the Jail a community standard of care and that ethical and professional standards of practice are maintained. Ms. Rhoton is sued in her official capacity.

## IV.      CLASS ACTION ALLEGATIONS

### Class Definition

28.     All Plaintiffs bring this action on their own behalf and, pursuant to Rule 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of a class of all qualified individuals who have mental illnesses that are disabilities as defined in 42 U.S.C. §12102 and 29 U.S.C. §705(9)(B), and who are now, or will be in the future, incarcerated at the Pierce County Jail.

### Numerosity: Fed. R. Civ. P. 23(a)(1)

29.     The proposed class is sufficiently numerous that joinder of all members of the class is impracticable.  The exact size of the class is unknown, however it is estimated to number in the hundreds.  As of Friday, November 30, 2017, there were approximately 1,102 individuals incarcerated in the Pierce County Jail.  *See* Legal Information Network Exchange (LINX), Jail population for November 2017, available at

https://linxonline.co.pierce.wa.us/linxweb/Reports/GetStaticReport.cfm?report_file=FormalCountList/201711.htm (last accessed Dec. 4, 2017).  According to the Federal Bureau of Justice Statistics, approximately 64 percent of individuals incarcerated in jail have a mental health issue,

Complaint - 7

*see* U.S. Dep't of Justice, Bureau of Justice Statistics, Special Report: Mental Health Problems of

Prison and Jail Inmates, (revised Dec. 14, 2006),

https://www.bjs.gov/content/pub/pdf/mhppji.pdf, and one in four jailed individuals meet the

criteria for "serious psychological distress." *See* U.S. Dep't of Justice, Bureau of Justice

Statistics, Indicators of Mental Health Problems Reported by Prisoners and Jail Inmates, 2011–

12 (June 2017),

https://www.bjs.gov/content/pub/pdf/imhprpji1112.pdf?utm_source=newsfrombjs&utm_medium

=email&utm_content=imhprpji1112_report_pdf&utm_campaign=imhprpji1112&ed2f26df2d9c4

16fbddddd2330a778c6=xbawkckbsa-xearbiza.  Further, approximately a quarter of individuals at

the Pierce County Jail are on psychiatric medications.  *See* League of Women Voters of Tacoma-

Pierce County, Study of Mental Health in Pierce County 35 (Feb. 2016),

http://www.piercecountywa.org/DocumentCenter/View/42628.

Commonality: Fed. R. Civ. P. 23(a)(2)

30.      There are questions of law and fact common to the class.  All class members are

subject to Pierce County's policies and practices that expose each one of them to a substantial

risk of harm with the resulting common question of law being the violation of the U.S

Constitution, the ADA, and the Rehabilitation Act (29 U.S.C. § 794).

Typicality: Fed. R. Civ. P. 23(a)(3)

31.      The claims of the Plaintiffs are typical of the claims of the members of the

proposed class.  Plaintiffs and all other members of the class have sustained similar injuries

arising out of and caused by Defendants' policies, practices, procedures, and customs in violation

of the law as alleged.

Complaint - 8

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

Adequacy: Fed. R. Civ. P. 23(a)(4)

32.     Plaintiffs are members of the class and will fairly and adequately represent and protect the interests of the putative class members.  Plaintiffs' counsel are experienced in class action and prisoners' rights litigation, and will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(b)(2)

33.     Because Defendants have acted and refused to act on grounds that apply generally to the class, final injunctive relief and corresponding declaratory relief is appropriate respecting the class as a whole.

V.        FACTUAL ALLEGATIONS

**A.  Defendants Fail to Provide Adequate Mental Health Screening**

34.     Defendants routinely fail to identify and assess the mental health issues of people incarcerated at the Pierce County Jail.

35.     During the booking process, medical providers are required to perform a receiving mental health screening using a "Suicide Risk Assessment" form as well as a "General Mental Health Assessment" form.  These forms include various questions about current mental health and mental health history, including suicidal ideation and psychiatric medications.  Most questions have a check box next to it to designate a positive finding.  By design, these forms do not allow for negative findings.

36.     Medical providers often do not ask all of the questions on the mental health screening forms.  As a result, people are not screened for serious psychiatric conditions that require medically necessary treatment.

Complaint - 9

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

37.     After the initial receiving screening, Defendants do not provide any additional mental health screening to the general jail population.

38.     Defendants' failure to adequately screen for mental health conditions violates well-established national standards, including those published by the National Commission on Correctional Health Care ("NCCHC"), one of the foremost authorities on health care in jails.

39.     NCCHC's 2014 "Standards for Health Services in Jails" require jails to inquire during the receiving screening into "[p]ast or current mental illness, including hospitalizations," as well as any "[h]istory of or current suicidal ideation."  *See* NCCHC Standard J-E-02 (Receiving Screening).  These inquiries are designed "to ensure that patients with known illnesses and those on medications are identified for further assessment and continued treatment."  *See id.*

40.     Additionally, NCCHC standards require jails to provide a more comprehensive mental health screening *for all inmates* within 14 days of admission, including inquiries into psychiatric hospitalization, suicidal behavior and ideation, and psychotropic medications, with further referral for evaluation and treatment for individuals with positive mental illness screens. *See* NCCHC Standard J-E-05 (Mental Health Screening and Evaluation).  This process includes compiling and reviewing medical records from community mental health providers to create a complete mental health history, and is designed to identify people with mental illness "soon after admission to prevent deterioration of their level of functioning and to [ensure that they] receive necessary treatment in a timely fashion."  *See* NCCHC Standard J-E-04 (Initial Health Assessment), J-E-05.

41.     In contrast to national standards, Defendants often fail to ask for and document information during the intake process that would identify people with mental illness for further

Complaint - 10

assessment and treatment. Defendants do not have a general practice of providing comprehensive

mental health screenings for people booked into the Jail.

42.     Defendants also fail to screen for mental illness despite clear signs of mental

decompensation and individuals' repeated requests to be seen and evaluated.

43.     Defendants' policies, practices, and procedures put Plaintiffs at an unreasonable

risk of harm and psychological decompensation.

**B.  Defendants Fail to Provide Adequate Mental Health Treatment**

44.     The Pierce County Jail has a "Mental Health Program" that claims to deliver

"high quality, cost effective mental health services . . . for the at-risk mentally ill inmate."  Pierce

County, Mental Health Services, http://www.co.pierce.wa.us/2110/Mental-Health-Services (last

accessed Dec. 4, 2017).

45.     This Program is managed by Defendant Janet Rhoton, and is budgeted for seven

"Mental Health Evaluators" ("MHE," also referred to as Mental Health Providers, or

"MHP").  The qualifications to work as an MHE include a Master's Degree in psychology, social

work, or a related field, as well as state licensing.  No medical degree is required.  MHE's are

responsible for evaluating psychological conditions, developing treatment plans, screening

referrals for psychiatric medications, and determining housing needs.  MHE's cannot prescribe

psychiatric medications and do not provide ongoing counseling.

46.     Pierce County Jail only has one doctor on staff, Dr. Miguel Balderrama, who also

serves as the Medical Director.  He, along with one psychiatric nurse practitioner, prescribe the

majority of psychiatric medications to people incarcerated in the Jail.

47.     No one on staff at the Jail is dedicated to providing mental health counseling.

Complaint - 11

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

48.     Referrals to the Mental Health Program are made through requests for evaluation and triage made by deputies, the medical clinic, courts, friends, and family.  An inmate can also request a referral by filing a "kite" (a written request) at an electronic kiosk in their unit.

49.     According to policy, the Mental Health Program must triage referrals "on severity of need and acuity."  If someone is "at imminent risk," they must be seen immediately; "high" priority referrals must be seen within 48 to 72 hours.  There is no required time frame for responses to those judged to be "moderate" or "low" priority.

50.     People with severe mental illness, including hallucinations and suicidal ideations, often file multiple kites over a period of weeks or months without ever seeing a Mental Health Evaluator in person.

51.     Mental Health Evaluators correspond with people suffering from mental illness primarily through written "kites." Evaluators rarely assess mental acuity in person.

52.     Instead, "kite" responses from Mental Health Evaluators often include "self-help" worksheets on breathing and stress-reduction techniques.

53.     When a Mental Health Evaluator does provides an in-person evaluation, these interactions are typically brief and do not provide basic mental health services.

54.     These practices and policies are counter to NCCHC standards, which require mental health services "available for all inmates who require them."  According to NCCHC, basic mental health services include identification and referral of individuals with mental health needs, crisis intervention services, psychiatric medication management, individual counseling, group counseling, and other mental health programming, and treatment documentation and follow-up.  *See* NCCHC Standard J-G-04 (Basic Mental Health Services).

Complaint - 12

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

55.     These basic mental health services are necessary to "alleviate symptoms of serious mental disorders and prevent relapses to sustain patients' ability to function safely in their environment.**"** *See id.*

56.     According to the Jail's website, medical staff is responsible for verifying "with a doctor's office or pharmacy any prescriptions brought in by an incoming arrestee."  *See* Pierce County, General Health Services, https://www.co.pierce.wa.us/2109/General-Health-Services (last visited Dec. 4, 2017).

57.     In practice, people incarcerated in the Jail with current prescriptions experience delays of weeks or months in receiving their psychiatric medications, even though those prescriptions are easily verifiable.

58.     People incarcerated in the Jail without a current prescription are routinely denied necessary psychiatric medications for the entire length of their stay at the Jail.  They are often not evaluated for or prescribed psychiatric medications, regardless of need or medical history.

59.     The denial of necessary psychiatric medication significantly increases the risk of psychological decompensation and self-harm.

60.     Defendants' denial of necessary psychiatric medications violates NCCHC standards that require jails to provide "prescribed medication in a timely, continuous, and clinically appropriate manner."  *See* NCCHC Standard J-D-02 (Medication Services).

61.     People "entering the facility on prescription medication [must] continue to receive the medication in a timely fashion as prescribed, or acceptable alternate medications are provided as clinically indicated."  *Id.*

62.     Failure to provide medications in a timely manner may have "grave consequences to patient health.  Therefore, inmates being admitted who report taking medications currently or

Complaint - 13

who bring the medications with them are to continue their medication unless there is a clinical reason to alter or discontinue the medication." *Id.*

63.    According to Pierce County Jail policy, individuals with prescription psychiatric medication must receive a three-day supply upon release into the community, but only if their medication is "indicated to prevent decompensation."

64.    However, in practice, Defendants refuse to provide individuals with mental illness their medications upon release.  Given the long wait times to see a provider in the community, this delay significantly increases the risk of psychological decompensation and self-harm.

65.    Defendants' refusal to provide people released into the community with a sufficient supply of psychiatric medication is also unlawful, places these individuals at risk of re-arrest, and is a threat to the public safety

66.    Defendants' practices are counter to NCCHC standards, which require that health staff "[a]rrange for a reasonably supply of current medications" for planned discharges.  *See* NCCHC Standards J-E-13 (Discharge Planning).  Providing access to medication upon release is essential to "ensure patients' health needs are met during transition to a community health care professional" and "may also help reduce recidivism." *Id.*

67.    Defendants' failure to provide psychiatric medication is compounded by their refusal to provide counseling or other mental health programming of any kind.

68.    The failure to provide mental health treatment via counseling and psychosocial/psychoeducational programs also violates NCCHC standards.  These standards recognize that "[m]ental health treatment is more than prescribing psychotropic medications. Treatment goals include the development of self-understanding, self-improvement, and

Complaint - 14

development of skills to cope with and overcome disabilities associated with various mental

disorders." NCCHC Standard J-G-04 (Basic Mental Health Services).

### C. Defendants Punish Plaintiffs for Their Mental Illnesses

69.     Without basic mental health treatment, people with mental illness incarcerated in

the Jail experience mental decompensation, delusions, hallucinations, and severe mood swings.

They have difficulty understanding and conforming their behavior to social norms and the rules

of the Jail as well as communicating appropriately with Jail staff and other inmates.

70.     Instead of providing these individuals with treatment, Defendants warehouse them

in solitary confinement and punish them with force and restraints, further exacerbating mental

illness.

### a.   Use of Isolation

71.     Defendants have a formal written policy of placing people with "poor behavioral

control due to a mental disorder" in "crisis cells" for 23 hours a day.  These cells are "one of the

most restrictive housing options" available at the Jail and constitute solitary confinement.  The

Mental Health Program staff is responsible for recommending placement in the crisis cells "for

safety concerns."

72.     Defendants also isolate people with mental illness for 20 to 21 hours a day, albeit

not in "crisis cell" units.  The Jail also operates a "Mental Health Unit," which is a unit for

individuals with mental illness who are considered "more vulnerable if placed in the general

population."

73.     Individuals who inform staff of their suicidal ideations are placed on "suicide

watch," which results in them being stripped of their clothing and draped in a "safety smock"

Complaint - 15

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

(also known as a "suicide smock") in solitary confinement.  Suicide watch is profoundly

dehumanizing and humiliating, and can further destabilize the people in mental health crisis.

74.     Even where there is no suicide danger, Defendants have a policy and practice of

using solitary confinement to warehouse people with mental illness and punish them for minor

behavioral issues, despite the known detrimental impact of isolation on this population.

75.     For example, people have been placed in isolation for talking erratically during

the booking process, having a history of mental health issues, being loud, and failing to follow

directions.

76.     A 2014 audit of the Jail found "a tendency to increase the custody level of any

offender who shows indications of mental health issues."  Bill Vetter, Evaluation of Pierce

County Corrections Bureau Jail Operations (Sept. 4, 2014),

https://www.co.pierce.wa.us/DocumentCenter/View/32482.

77.     People with severe mental illness can remain in solitary at the Jail for weeks or

months at a time, which significantly increases the risk of psychological decompensation and

self-harm.

78.     While there, they are also largely unable to access services, programs, and

activities provided in the Jail.  These include telephone services, in-person visitation, hygiene

activities, outdoor exercise, administrative, disciplinary, and classification proceedings, the

"kite" and grievance systems, library services, access to reading materials, commissary services,

and educational, vocational, religious, recreational, and other programming.

79.     Defendants' isolation of the seriously mentally ill violates NCCHC policy, which

prohibits the use of solitary confinement "of any duration" for people with mental illness because

it is "harmful to an individual's health."  National Commission on Correctional Health Care

Complaint - 16

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

("NCCHC"), Solitary Confinement (Isolation) Position Statement, adopted Apr. 10, 2016:

http://www.ncchc.org/solitary-confinement (last visited Dec. 4, 2017).

80.     Defendants' policies permitting mental health staff to recommend placement of a person with a serious mental illness in solitary also violates ethical standards for the medical profession.  According to NCCHC, "Health staff must not be involved in determining whether adults or juveniles are physically or psychologically able to be placed in isolation."  *Id.*  Instead, the proper role of health professionals is to review an individuals' health record to determine whether their "mental health needs contraindicate the placement or require accommodation." NCCHC Standard J-E-09 (Segregated Inmates).

### b.   Use of Force and Restraints

81.     In 2016, Pierce County Jail deputies logged nearly 1100 "use of force" reports. This included the use of "OC" (oleoresin capsicum spray, also known as "pepper spray," pepperball launchers, and expulsion grenades), restraint chairs (a wheelchair with restraint straps for the arms, torso, and legs), "Lateral Vascular Neck Restraints" (a potentially lethal "blood choke" that restricts blood flow to the brain), and "eyebolts," which are metal bolts used to chain a person's hands and feet to the concrete floor.

82.     Jail policy dictates that "[p]roper restraints will only be used as a precaution against escape, to prevent self-injury, injury to others or property damage," and that "[i]n no event is physical force justifiable as a punishment."

83.     According to Jail policy, restraint chairs are "not a medical restraint." They are intended only to restrain "violent out-of-control" people and are not meant to be used as punishment.  The decision to place an individual in a restraint chair is solely at the discretion of corrections deputies, not medical or mental health staff.

Complaint - 17

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

84.     Jail policy also states that the eyebolts may be used "when deemed necessary," but are intended for use on "violent out-of-control inmates."  According to policy, any use of the eyebolts must be videotaped, and mental health staff may provide input as to whether people can endure the restraints for longer than four hours, and for up to a maximum of eight hours.  A person can be restrained for longer than 8 hours if ordered by Jail administration.

85.     In violation of the Jail's written policy, deputies' own use of force reports reveal that force and restraints are deployed for minor behavioral issues directly attributable to mental illness.  Deputies often use force and restraints to punish non-violent behavior such as lack of cooperation, kicking and punching cell doors, covering cell windows, and profanity.

86.     For example, on January 3, 2017, a woman with mental illness was screaming in her cell and punching her cell door.  Deputies sprayed her with pepper spray, handcuffed her, and placed her face down on a mattress before shackling her hands and feet to eyebolts, where she was left restrained for three hours.

87.     On February 9, 2017, a man with mental illness was kicking his cell door and yelling.  He was placed face down on a mattress and his legs and arms were shackled to the eyebolts "to prevent him from causing further disturbances."  While the man was chained to the floor, a deputy "delivered a short hammer strike to the right side of [his] jaw" because the deputy believed the man was trying to bite him.  The man remained restrained in the cell for approximately eight hours.

88.     On February 23, 2017, a man on suicide watch was placed in a restraint chair for putting a mattress and toilet paper against his window and "yelling unintelligibly" after urinating on himself.  Deputies decided the restraint chair was necessary to help the man "cool off," despite the fact that the man complied with requests to remove the toilet paper from his window,

Complaint - 18

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

complied with the restraint process, and "sat down in the chair on his own."  While restrained the man informed deputies that he was not receiving his proper medication.

89.     On March 14, 2017, a man with mental illness was placed in a restraint chair for covering up his cell door with blankets and ripped pieces of his mattress.  The man remained in the restraint chair for several hours.

90.     The use of force and restraints to punish behavior that is attributable to individuals' mental illness causes unnecessary physical and psychological harm.

**D.  Plaintiffs Suffer Ongoing Irreparable Injury as a Result of Defendant's Actions**

91.     Defendants fail to provide basic mental health services to people incarcerated in the Pierce County Jail, and subject people suffering from mental illness to isolation and uses of force and restraints when they predictably decompensate.  As a result of Defendants' actions, Plaintiffs and other similarly situated suffer irreversible psychological harm.

**a.  Plaintiff Donald Bango**

92.     Plaintiff Donald Bango is a 40-year old decorated veteran who served in the United States military for fifteen years, including tours in Iraq and Afghanistan.

93.     On October 6, 2015, approximately two months prior to Mr. Bango's arrest, he met with a doctor at Veteran's Affairs for an annual physical.  The provider noted his diagnoses for bipolar disorder, PTSD, major depressive disorder, and panic disorder, and reviewed Mr. Bango's current medication list, including Venlafaxine (brand name Effexor), an anti-depressant, and Prazosin, a drug used to treat PTSD and anxiety.

94.     Mr. Bango was arrested on December 13, 2015.  Mr. Bango informed the Emergency Medical Technician (EMT) who evaluated him during the booking process that he had been diagnosed with serious mental illnesses and received counseling and medication from

Complaint - 19

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

Veteran's Affairs.  He also informed the EMT that he had considered committing suicide the previous year by shooting himself.

95.     Jail staff did not attempt to confirm Mr. Bango's diagnoses or medications by requesting his medical records from Veteran's Affairs.

96.     Mr. Bango was placed on "suicide watch" shortly after booking.  He was stripped of his clothing, placed in a "suicide smock," and put in solitary confinement in the 3 South wing of the Jail, also known as the "hole."

97.     While on suicide watch, Defendants did not provide Mr. Bango with basic mental health care beyond assessing his suicidal ideations.

98.     As a result, Mr. Bango began to mentally decompensate and "just wanted to die." He began to have delusions and hallucinations, and started to believe that the sprinkler light in his cell was sending him signals, telling him to kill himself.

99.     After several days in isolation, Mr. Bango decided he could not handle the signals from the sprinkler light any longer, and wrapped his suicide smock around the sprinkler to dislodge it.  This caused the sprinkler to break and flood Mr. Bango's cell with black, putrid water.

100.     In response, Jail deputies rushed into Mr. Bango's cell and tackled him to the ground.  Deputies then handcuffed Mr. Bango behind his back.  Deputies then sprayed Mr. Bango in the face with pepper spray.  Deputies put Mr. Bango in an adjacent cell, where they left him for several hours without any clothing.

101.     Mr. Bango sat naked on the cell floor with pepper spray on his face and his arms handcuffed behind his back for several hours.  Because he was restrained, Mr. Bango was not able to clean the pepper spray from his face and it burned his eyes and nose.  A deputy noted in

Complaint - 20

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

his report that Mr. Bango "bang[ed] his head a few times to get our attention," but refused to uncuff him because Mr. Bango was "display[ing] uncooperative actions" and would not "sit quietly." When a nurse came to take Mr. Bango's blood pressure, the deputies refused to uncuff him.

102.     During those hours that he was restrained in the cell, Mr. Bango felt he was in the worst place he had ever been in his life and wanted to die.

103.     After several days on suicide watch and in other isolation cells, Mr. Bango was moved to another area of the Jail, where he was placed in the general population. Mr. Bango continued to have periodic hallucinations and delusions, including hearing voices, which he attributed to his cellmates.

104.     On December 20, 2015, seven days after he was booked, Mr. Bango sent a kite requesting his psychiatric medications and noting that he was concerned about "falling into further mental health crisis or psychosis." A mental health provider responded, "[c]ase reviewed no MH [mental health] appointment at this time."

105.     On December 28, 2015, Mr. Bango kited again to request his medications. He also noted that he "was given my meds through the VA hospital." A mental health provider responded, "It appears that your medication was not current when booked into PCJ [Pierce County Jail]. Case reviewed no MH appointment at this time."

106.     Mr. Bango's Veteran's Affairs records indicate that he had active prescriptions for the psychiatric medications Effexor and Prazosin when he was arrested and booked into the Jail.

107.     On January 11, 2016, a mental health provider interviewed Mr. Bango. He informed the provider that his cellmate "won't stop talking." The provider noted that Mr. Bango had made similar statements about his previous cellmate talking too much. Instead of

Complaint - 21

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

1

2

investigating further, the provider decided that Mr. Bango was "unable to get along with his

roommate." Mr. Bango was in fact experiencing auditory hallucinations.

3

4

5

108.    Mr. Bango kited again on January 15, 2016, stating that he had not "seen anyone

about my mental health meds." A mental health provider responded "MH interviewed you on

01/11/16 they cleared you per class."

6

7

8

9

10

11

109.    On January 21, 2016, two representatives from Veteran's Affairs, a chaplain and a

social service provider, came to the Jail and spoke to one of the mental health providers. They

asked whether Mr. Bango was receiving his psychiatric medications. The provider reviewed Mr.

Bango's chart and determined that he had not followed up with treatment for four months prior

to his arrest. In fact, Mr. Bango had met with a provider at least two months prior to his arrest

and had current prescriptions when he was arrested.

12

13

14

15

110.    Mr. Bango kited yet again on February 2, 2016, stating that he needed "to see a

mental health pro ASAP . . . I need my meds and to see a MHP [mental health provider]. I[']m

trying to use the appropriate channels." A mental health provider responded that "[t]his request

has been answered numerous times. Do not kite regarding this matter again."

16

17

18

19

20

111.    Mr. Bango kited the following day, on February 3, 2016, stating "I need to see a

mental health person…I am a veteran that served in the military…I suffer from several mental

disabilities from this and I am in dire need for my medication…Thank you for your time and

patience." He was informed that his "medications have not started because you did not follow

up with the community mental health care provider for a while prior to booking."

21

22

112.    Mr. Bango's Veteran's Affairs records indicate that he had met with a provider on

October 6, 2015, approximately two months before his arrest.

23

Complaint - 22

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

113.    After receiving the response to his February 3 kite, Mr. Bango decided to stop asking for mental health treatment because he feared he would be punished by being demoted a classification "level," which would restrict his access to visitation, the telephone, commissary services, and possibly result in him being placed in the "hole" again.

114.    For the next year, Mr. Bango spent most of his time in his cell, avoiding social interaction as his mental illness worsened.  His hallucinations intensified and he had trouble sleeping.  When he did come out of his cell, he had auditory hallucinations, imagining that others in his unit were verbally threatening him.  When sharing a cell with another person, Mr. Bango would hallucinate that his cellmate was talking to him.

115.    On March 8, 2017, approximately 15 months after Mr. Bango's arrest, Pierce County Jail requested his medical records from Veteran's Affairs.

116.    On March 10, 2017, Mr. Bango kited mental health staff again after his wife urged him to seek treatment.  Mr. Bango stated, "I need to see a MHP ASAP.  I[']m a veteran who has been diagnosed with PTSD.  I'm not getting any mental health care…I'm starting to have a hard time thinking clear because I have not slept.  I don[']t know if [my cellmate] is talking to me at night or if I[']m hearing voices."  A mental health provider responded, "We understand you are having a hard time, but we do not have control over housing in that unit."

117.    On March 11, 2017, Mr. Bango responded, "Ok.  I understand that you may not have control of housing but I would like to see and talk to MHP.  Are you telling me to just suck it up and continue to have a hard time or can I be evaluated to see if we can come to a solution."  A mental health provider responded, "You do not meet requirements to be seen [b]y MHP.  You must focus on other coping skills to help you through this difficult time."

Complaint - 23

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

118.     On July 28, 2017, Mr. Bango sent a kite stating, "I need to see mental health ASAP for PTSD bipolar and related depression problems.  I need to know why I can[']t get my meds.  I requested my records.  They are here at PCJ, I got the copies and I[']m still not being treated for mental health."  A mental health provider responded, "You have been at PCJ for a year and a half now, [h]ow have you been coping without medications up to this point?"  Mr. Bango responded, "I[']m not a professional and that isn[']t a question I can answer other than to say I have not been doing good without medication or treatment for my PTSD traumatic brain injury bipolar disorder and panic disorder.  I have made several attempts and requests from Dec 2015 until now and have continuously been refused mental health treatment.  I am having increased episodes of vivid nightmares flashbacks and anxiety.  Why am I being denied basic mental health services…I[']m begging once again for someone to please address my issues."  A mental health provider responded, "We understand you are having a hard time but we do not start mental health medications that were not current in community and do not provide ongoing counseling.  We will send you some mental health worksheets to help teach you new coping skills and a list of providers that you can follow up with when you get out of jail."

119.     On August 4, 2017, Mr. Bango filed a grievance concerning the lack of mental health care.  He noted that he had been requesting care since December 2015.  A mental health provider responded, "[Y]our requests for medications have been reviewed in the past.  I have now referred you to see the nurse practitioner to determine if medications will be prescribed for you here at PCJ [Pierce County Jail]."

120.     A psychiatric nurse practitioner and mental health provider came to see Mr. Bango on August 16, 2017, but only spent a few minutes discussing his symptoms before

Complaint - 24

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

prescribing Setraline (brand name Zoloft), an anti-depressant, and Prazosin, a drug used to treat PTSD.

121.   On August 24, 2017, the psychiatric nurse practitioner visited Mr. Bango again, but this interaction was equally brief and the only treatment provided as an increase in dosage of his Zoloft prescription and the addition of a new medication, Trazadone, "for racing thought[s] at bedtime."

122.   On August 25, 2017, Mr. Bango filed an appeal of his grievance because he had not received comprehensive mental health treatment, including ongoing mental health screening and evaluation, crisis intervention, medication management, individual and group counseling, and mental health programming.  Mr. Bango requested mental health treatment consistent with national standards.

123.   On September 7, 2017, Mr. Bango sent a kite indicating that he was hearing voices despite putting earplugs in his ears.  Staff responded by asking him if he wanted "handouts on coping."

124.   On September 9, 2017, Mr. Bango sent a kite stating that he had not slept in five days.

125.   Mr. Bango again saw the psychiatric nurse practitioner on September 12, 2017, who noted that he was hearing voices.  However, the only care provided was an increase in his prescription medications.

126.   On September 13, 2017, Mr. Bango requested information on the side effects for his medications.  On September 15, 2017, he made the same request, noting that mental health staff had "fail[ed] to provide informations [sic] sheets about medications when requested and never sit and counsel patients or provide the opportunity or access to the provider to do so."

Complaint - 25

127.    On September 17, 2017, Mr. Bango sent a kite stating that he was "seeing thi[n]gs that talk to me" and was afraid that people "can hear me through the radios and satalites [sic]." A mental health provider responded, "[h]ave you ever been treated for mental health issues? Have you taken meds before?"  Mr. Bango responded, "I have been on meds for 10 years . . . Don[']t you people look at our file or meds or talk to each other, do you even care that I[']m under attack right now?"

128.    On October 2, 2017, Mr. Bango sent a kite stating "I[']m trying to get away from them but they are using the satalites [sic] to track me and control my brains, I[']m supposed to have the surgery to take out the Army implant.  The voices are com[]ing through the radios and intercom.  When I look for them I only see their shadows but they are there . . . . Are they here intercepting my thinking, I just need to know the truth and what they are using them for.?"  A mental health provider responded, "You may speak with your attorney about this.  You will have to follow up with ARNP [nurse practitioner]."

129.    On October 4, 2017, a nurse practitioner saw Mr. Bango and noted that he was worried about being tracked by satellites.  The nurse practitioner increased his Zoloft prescription.

130.    On October 12, 2017, Mr. Bango sent a kite stating, "Someone is trying to give me poison in my medication and my trays.  Why are the[y] saying it through the radio and intercom, please send the codes to me and I will translate."  A mental health provider responded, "Did you report these symptoms to the prescriber when you saw her last week?"

131.    On October 18, 2017, a psychologist met with Mr. Bango and documented reported hallucinations and delusions, including being injected with a monitoring device in his arm and seeing soldiers in the Jail.

Complaint - 26

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

132.    Mr. Bango continues to have hallucinations, extreme nightmares, and severe mood swings.

133.    Mr. Bango believes that he may be taking the wrong combination of psychiatric medications.  He was prescribed Zoloft, an anti-depressant medication that is not typically used to treat bipolar disorder, and can cause manic episodes if not paired with a mood stabilizing drug. Symptoms of mania can include psychosis.

134.    Mr. Bango's mental health has decompensated significantly since his booking into the Jail due to Defendants' failure to provide timely adequate mental health care.

135.    Defendants have denied Mr. Bango medically necessary psychiatric medications and access to mental health providers during his incarceration.  They have also improperly placed him in solitary confinement and left him alone in a cell with his arms handcuffed behind his back after pepper spraying him in the face.  The inappropriate use of isolation and force as well as the denial of care has caused Mr. Bango to decompensate.

b.  **Plaintiff Scott Bailey**

136.    Plaintiff Scott Bailey is a 45-year old man who is currently incarcerated in the Pierce County Jail and who has been diagnosed with major depression and experiences anxiety. Mr. Bailey regularly experiences suicidal ideation and has attempted to commit suicide many times. Mr. Bailey has been incarcerated at the Pierce County Jail approximately eight times, dating back to 1999.  Defendants placed Mr. Bailey on suicide watch during his incarceration in December 2014, including placing him in isolation with no clothing except a "suicide smock," and thus are aware of Mr. Bailey's mental health issues and suicidal tendencies.

137.    When Mr. Bailey was booked into the Jail on April 21, 2016, a nurse noted that he was "[n]ot happy" about his arrest, but left all other mental health categories blank, including

Complaint - 27

Mr. Bailey's treatment history, previous suicide attempts, and depression levels, despite noting that Mr. Bailey was "cooperative" with the assessment.

138.     Similarly, when Mr. Bailey was booked into the Jail on July 31, 2016, the nurse noted that S.B. was "[n]ot happy about" his arrest but cooperative, and left all other mental health categories blank.

139.     When Mr. Bailey was booked into the Jail on January 30, 2017, the receiving nurse noted that he was currently feeling depressed, had a current feeling of depression of a "4-6" on a scale of 10, and had tried to commit suicide in 2012 by cutting his wrist.  The nurse noted that Mr. Bailey "[a]ppears to be coping well" and left all other mental health categories blank.

140.     When Mr. Bailey was booked into the Jail on April 2, 2017, the nurse noted that he was "not real pleased" about his arrest and cooperative with the intake assessment, but left all other mental health categories blank.  These included the categories for "currently feel[ing] depressed," "currently have thoughts of self harm or suicide," "[c]urrent or [p]ast [t]reatment for mental health issues," "[p]ast suicide attempts, strong plans, or treatment for attempts," and "[h]ad any treatment for mental health issues or suicide risk during any previous incarceration[.]"

141.     Mr. Bailey recalls that he informed the nurse on April 2, 2017, about medications he had previously taken for his mental health.  According to Mr. Bailey's medical records, he had previously taken Hydroxyzine, an anti-anxiety medication, Remeron, an anti-depressant, Prazosin, a drug typically used to treat PTSD, and Clonidine, an anti-anxiety medication as prescribed by a provider in September 2014.  However, there are no notes on Mr. Bailey's booking form indicating previous treatment for mental illness.

Complaint - 28

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

142.    On April 20, 2017, approximately three weeks after his arrest, Mr. Bailey sent a kite requesting to see a mental health provider, noting that he was "extremely depressed."  A mental health provider responded, "We understand you are having a hard time but we do not start mental health medications that were not current in the community and do not provide on going counseling.  We will send you some mental health worksheets to help teach you new coping skills and a list of providers that you can follow up with when you get out of jail."  The worksheets Mr. Bailey received included instructions on getting enough sleep and exercising.

143.    On May 20th, 2017, Mr. Bailey requested a grievance form to grieve the lack of mental health treatment.  A mental health provider asked him, "[h]ave you req[ue]sted to be seen by [a mental health provider]?  What do you want to be seen for?..."  Mr. Bailey responded that he had previously asked to be seen, had a history of mental health issues, including depression and anxiety, and "would appreciate being seen by someone ASAP if possible . . . . I was taking meds in the past and need to get restarted with that as well.  Thanks."  A mental health provider responded, "[mental health] is not set up to do treatment.  Would you like handouts on coping skills?"  Mr. Bailey declined the handouts, noting that he had received them already.

144.    On May 26, 2017, a mental health provider noted that Mr. Bailey had filed a grievance seeking counseling and medications, and "did not appear to tell the [booking] nurse of any meds or services."

145.    The same day that Mr. Bailey filed his grievance, he was seen by two mental health providers.  One provider documented that Mr. Bailey was "depressed and crying" during the interview.  The provider also documented that Mr. Bailey had previously been hospitalized for his mental illness and had tried to commit suicide in the past by "biting his wrist, trying to

Complaint - 29

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

1   smother himself and OD on cocaine." The provider noted that Mr. Bailey experienced ongoing

2   suicidal ideation and should be referred to the psychiatric nurse practitioner for treatment.

3        146.    When Mr. Bailey asked the providers if he was only being seen because he had

4   filed a grievance, one of the providers made a statement that implied that the mental health

5   providers would delay evaluating people until they had filed a grievance.  The providers' notes

6   reflect that Mr. Bailey was seen "due to Grievance."

7        147.    On June 10, 2017, Mr. Bailey sent a kite asking when he would be seeing

8   "someone to get medications started," *i.e.,* the psychiatric nurse practitioner.  A mental health

9   provider responded, "Our list is very long. It may be a little while longer before you can be

10  seen."

11       148.    The psychiatric nurse practitioner did not evaluate Mr. Bailey for treatment until

12  June 16, 2017, almost three weeks after Mr. Bailey's depression and suicidal tendencies were

13  noted in the Jail's medical record.  The nurse practitioner assessed Mr. Bailey with major

14  depression, nearly two and a half months after he had been admitted to the Jail, and prescribed

15  medications, including Hydroxyzine, an anti-anxiety medication, and Setraline (brand name

16  Zoloft), an anti-depressant.

17       149.    On July 11, 2017, Mr. Bailey filed a grievance appeal, stating that the Jail was not

18  providing treatment or counseling on a regular basis and that "I should not have to file a

19  grievance to receive help from M.H.P . . . . A schedule of regular treatment needs to be made

20  available to all who need it.  Not to those select few who complaint the loudest."

21       150.    Mr. Bailey has not had any follow-up appointments with a mental health provider

22  since June 16, 2017.

23

Complaint - 30

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

151.    Defendants have routinely failed to adequately screen Mr. Bailey's mental health conditions, mental health history, or use of psychiatric medications.  Further, Defendants have refused to provide Mr. Bailey with timely access to psychiatric medications or other basic mental health services, despite his repeated requests for treatment.  This has placed Mr. Bailey at an unreasonable risk of self-harm and psychological decompensation.

E.    **Defendants Are Deliberately Indifferent to Plaintiffs' Constitutional Rights**

152.    Pierce County has long been the target of protracted litigation regarding its substandard mental health care.  Additionally, it has a history of contracting with private for-profit health care providers that are known to provide constitutionally inadequate services to correctional facilities.  These facts, in addition to Defendants' acknowledgement of the receipt of Plaintiffs' counsel's recent letter demanding changes to policies and practices in the Jail, demonstrate that Defendants are on actual notice—and thus intentionally and/or deliberately indifferent—to their violations of Plaintiffs' and similarly situated individuals' constitutional rights.

153.    In 1995, the American Civil Liberties Union of Washington (ACLU-WA), in cooperation with Evergreen Legal Services and the Puget Sound Assistance Foundation, sued Pierce County in federal court regarding unconstitutional conditions in the Pierce County Jail.  The resulting class action, *Herrera v. Pierce County*, including causes of action challenging Pierce County Jail's inadequate mental health care.  *See* Dkt. #12, First Amended Complaint for Declaratory and Injunctive Relief, No. C95-5025-FDB at 27–28 (W. Wa. Mar. 17, 1995).

154.    The *Herrera* litigation was resolved through a series of stipulated orders in 1995 and 1996.  *See* Dkt. #89, Stipulated Order and Final Judgment, No. C95-50525-FDB (W. Wa. Mar. 28, 1996).  Pursuant to these orders, Pierce County was required to create a mental health

Complaint - 31

unit, increase health care staffing, implement mental health training, and adopt constitutional medical care standards, policies, and procedures using the National Commission on Correctional Health Care (NCCHC) and the American Public Health Association (APHA) as guidelines. *See id.* at 5–6; *see also* Dkt. #41, Stipulated Order, No. C95-5025-FDB (W. Wa. Oct. 31, 1995). Pierce County was also specifically required to create and annually update policies and procedures "regarding the use of and conditions in crisis cells and other cells (including booking cells) used to isolate prisoners with suicide risks or mental health related behavioral problems." Dkt. # 89 at 7.  The case was dismissed pursuant to settlement in 2011. *See* Dkt. # 372 Stipulation and Order of Dismissal with Prejudice, No. C95-5025-RBJ-JKA (W. Wa. Feb. 25, 2011).

155.    Since the dissolution of the *Herrera* settlement agreement, Pierce County Jail has made several concerning and questionable changes to its mental health care services, including contracting with private corporations for the provision of medical and mental health services in the Jail.  Several of these private corporations have been the subject of repeated lawsuits regarding substandard medical and mental health care.

156.    Regardless of the existence of any contracts with private entities to provide mental health care at the Pierce County Jail, Defendants are ultimately responsible for the mental health care, treatment, and safekeeping of individuals incarcerated at the Pierce County Jail and cannot contract away their constitutional and statutory obligations to provide minimally adequate mental health care.

157.    On August 28, 2017, Plaintiffs' counsel sent a letter to Defendants.  This letter detailed Defendants' unlawful policies, practices, procedures, and customs towards individuals with mental illness confined at the Pierce County Jail.

Complaint - 32

158.     On September 11, 2017, Pierce County Sheriff's Department spokesman, Ed

Troyer, referenced the letter from Plaintiffs' counsel at an "Adults Civics Happy Hour" event at

the Pacific Brewing & Malting Company in Tacoma, Washington.  He stated: "Actually we have

the ACLU coming after us now for – we do have too many people with mental health in the jail

and not enough services.  And we were laughing [in response to the letter] and saying, 'We've

been ringing that bell and beating that drum for ten years, where have you been?  Come help

us.'"[1]

159.     Because the Defendants were on actual notice of their violations, their acts and

omissions reflect that they were intentionally and/or deliberately indifferent to Plaintiffs' and to

similarly situated individuals' constitutional rights.

## VI.        CAUSES OF ACTION

### COUNT ONE
**(Violation of the Eighth Amendment to the United States Constitution (42 U.S.C. § 1983))**
**By Plaintiffs DONALD BANGO, SCOTT BAILEY and the Proposed Class Against Defendants, Pierce County, Bruce Dammeier, Pierce County Sheriff's Department, Paul A. Pastor, Patti Jackson-Kidder, and Janet Rhoton**

160.     By their policies and customs as described above, Defendants subject Plaintiffs

and the class of similarly situated individuals who they seek to represent to a substantial risk of

harm from inadequate mental health care and use of isolation, force, and restraints.  These

policies and customs have been, and continue to be, implemented by Defendants and their agents

or employees in their official capacities, and are the proximate cause of the violation of

---

[1] A video of this event is available on the MovetoTacoma.com Facebook page (Mr. Troyer's statement begins around 1:19:22): https://www.facebook.com/movetotacoma/videos/1954453684811831/ (last accessed Dec. 4, 2017).

Complaint - 33

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

Plaintiffs' and the proposed class's rights under the Eighth Amendment to the United States Constitution.

161.    Defendants have been and are aware of all of the violations listed above, and have been deliberately indifferent to these violations.

WHEREFORE, Plaintiffs and the class they seek to represent request relief as outlined below.

### COUNT TWO
**(Violation of the Fourteenth Amendment to the United States Constitution (42 U.S.C. § 1983))**
**By Plaintiffs DONALD BANGO, SCOTT BAILEY and the Proposed Class Against Defendants, Pierce County, Bruce Dammeier, Pierce County Sheriff's Department, Paul A. Pastor, Patti Jackson-Kidder, and Janet Rhoton**

162.    By their policies and customs as described above, Defendants subject Plaintiffs and the class of similarly situated individuals who they seek to represent to a substantial risk of harm from inadequate mental health care and use of isolation, force, and restraints. These policies and customs have been, and continue to be, implemented by Defendants and their agents or employees in their official capacities, and are the proximate cause of the violation of Plaintiffs' and the proposed class's rights under the Fourteenth Amendment to the United States Constitution.

163.    Defendants have been and are aware of all of the violations listed above, and have been deliberately indifferent to these violations.

WHEREFORE, Plaintiffs and the class they seek to represent request relief as outlined below.

### COUNT THREE
**(Violation of the Americans with Disabilities Act (42 U.S.C. § 12132 et seq.))**
**By Plaintiffs DONALD BANGO, SCOTT BAILEY and the Proposed Class Against Defendants Pierce County and Pierce County Sheriff's Department**

Complaint - 34

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

164.    Under the Americans with Disabilities Act, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

165.    Defendants Pierce County and Pierce County Sheriff's Department are public entities as defined in 42 U.S.C. §12131(1)(A).

166.    Plaintiffs are qualified individuals with a disability, as that term is defined in 42 U.S.C. §12102(2).  They all suffer from a mental impairment that substantially limits one or more "major life activities," including, *inter alia,* caring for oneself, eating, sleeping, speaking, learning, reading, concentrating, thinking, communicating, and working.  *See* 42 U.S.C. §12102(2)(A).

167.    The programs, services, and activities that Defendants Pierce County and the Sheriff's Department provide to individuals incarcerated at the Pierce County Jail include, *inter alia*, mail and telephone services, in-person visitation, hygiene activities, outdoor exercise, administrative, disciplinary, and classification proceedings, the "kite" and grievance systems, library services, access to reading materials, commissary services, and educational, vocational, religious, recreational, and other programming.

168.    Defendants Pierce County and the Sheriff's Department discriminate against, unjustly segregate, and fail to make reasonable modifications to policies, practices, and procedures for Plaintiffs and the class they seek to represent.  As a result, Plaintiffs and the proposed class are excluded from participation in and denied the benefits of the Pierce County Jail's services, programs, and activities.

Complaint - 35

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

WHEREFORE, Plaintiffs and the class they seek to represent request relief as outlined below.

## COUNT FOUR
### (Violation of the Rehabilitation Act (29 U.S.C. § 794))
### By Plaintiffs DONALD BANGO, SCOTT BAILEY, and the Proposed Class Against Defendants Pierce County and Pierce County Sheriff's Department

169.    Under Section 504 of the Rehabilitation Act, "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  *See* 29 U.S.C. § 794(a).

170.    At all relevant times, Defendants Pierce County and the Pierce County Sheriff's Department received Federal financial assistance as that term is used in 29 U.S.C. § 794, including receiving funding under the U.S. Department of Justice's State Criminal Alien Assistance Program (SCRAAP).

171.    All of the operations of Defendants Pierce County and the Pierce County Sheriff's Department qualify as "programs or activities," as those terms are defined in 29 U.S.C. § 794(b). This includes all operations of the Pierce County Jail.

172.    Plaintiffs and the class they seek to represent are qualified individuals with disabilities as that term is defined in 29 U.S.C. § 705(20) and 42 U.S.C. § 12102.

173.    By their polices, practices, and procedures, Defendants Pierce County and Pierce County Sheriff's Department violate the rights of Plaintiffs and the class they seek to represent under the Rehabilitation Act by discriminating against them and excluding them from, and denying them the benefits of, the operations of the Pierce County Jail.

Complaint - 36

WHEREFORE, Plaintiffs and the class they seek to represent request relief as outlined below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays that the Court:

1.      Issue an order certifying this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2);

2.      Declare that Defendants' acts, omissions, policies, practices, procedures, and customs as described in this Complaint violate the Eighth and Fourteenth Amendments to the Constitution, Title II of the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act.

3.      The issuance of injunctive relief restraining Defendants from violating the Eighth and Fourteenth Amendments to the United States Constitution, Title II of the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act;

4.      For an award of Plaintiffs' costs and attorneys' fees;

5.      For leave to amend these pleadings to conform to the evidence as presented at trial; and

6.      For such other and further relief as the Court may deem just and proper.

DATED this 4th day of December, 2017.

Respectfully submitted,

By:

/s/Antoinette M. Davis
Antoinette M. Davis, WSBA No. 29821
tdavis@aclu-wa.org

Complaint - 37

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

/s/Jessica Wolfe
Jessica Wolfe, WSBA No. 52068
jwolfe@aclu-wa.org
AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
Telephone: (206) 624-2184

/s/Salvador Mungia
Salvador Mungia, WSBA No. 14807
SMungia@gth-law.com
/s/Janelle Chase Fazio
Janelle Chase Fazio, WSBA No. 51254
jchasefazio@gth-law.com
GORDON THOMAS HONEYWELL
1201 Pacific Ave, #2100
Tacoma, WA 98492
Telephone: (206) 620-6500

*Attorneys for Plaintiffs*

Complaint - 38